UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ANOR NARGIZ UZAKOVA,

               Plaintiff,               **MEMORANDUM AND ORDER**

    v.                        **21-CV-550 (ST)**

HAIM JAVAHERI AND MITCHELL JAVAHERI,

               Defendants.

------------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

Plaintiff, Anor Nargiz Uzakova ("Plaintiff"), brought an action against Haim Javaheri and Mitchell Javaheri ("Defendants") alleging, *inter alia*, failure to pay overtime violations under both the Fair Labor Standard Act ("FLSA") and New York labor Law ("NYLL"). Now before this Court are the parties' Cross-Motions for Summary Judgment ("Motions").[1]

The parties consented to jurisdiction by the undersigned in this matter and for adjudication of the instant Motions specifically.

For the below stated reasons, this Court grants Defendants' Motion for Summary Judgment in its entirety and denies Plaintiff's Motion for Summary Judgment in its entirety.[2]

## I.    BACKGROUND

### A.  Summary of Facts

1.  <u>The Parties</u>

Plaintiff, Anor Nargiz Uzakova, is an adult individual residing in Nassau County New

---

[1] Note, the title of Plaintiff's Motion is "Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment Against *Defendant Haim Javaheri*" only. *See* ECF 40-3. However, as discussed *infra*, given that Plaintiff makes arguments concerning Defendant Mitchell in her Motion, the Court will consider those arguments as well.

[2] To be clear, the Court declines to award Defendants attorneys' fees and costs based upon the case law discussed *infra* despite granting Defendants' Motion.

York.  *See* Pl. Compl. at ¶ 5, ECF 1.  Ms. Uzakova was employed by Defendant Haim Javaheri ("Defendant Haim" or "Haim") to care for him in his home on or about August, 2015 until around August, 2019.  *Id.* at ¶¶ 7-8.

Defendant Haim Javaheri is an individual over 80 years old who hired Plaintiff to care for him as discussed above.  *Id.* at ¶¶ 21-22.

Defendant Mitchell Javaheri ("Defendant Mitchell" or "Mitchell") is Defendant Haim's son.  *See* Defendants' Mot. at 3, ECF 39-8.[3]

2.  Events Surrounding Plaintiff's Hiring and Plaintiff's Interactions with Haim's Family[4]

Defendant Haim's daughter, Bita Pouyafar f/k/a Bita Javaheri (Bita), met with Plaintiff prior to Plaintiff being hired.  *See* Deposition of Plaintiff Anor Nargiz Uzakova, dated August 15, 2022 ("Plaintiff Dep.") at 19:3-7, ECF 39-5.  Defendant Haim determined Plaintiff's salary.  *Id.* at 30:1-10.

The hiring agency initially told Plaintiff that she would be paid $700.00 per week.  *Id.* at 13:21-14:13.  Defendant Haim then later told Plaintiff that she would actually be paid $600.00 per week.  *Id.* at 50:15-51:2.  However, Plaintiff's salary was subsequently increased to $700.00 per week.  *Id.* at 79:23-25.

Plaintiff further admitted that Haim paid Plaintiff directly for about three years until she approached Mitchell and complained that Haim was giving her difficulty about being paid. Plaintiff specifically explained that she did not want Haim to pay her directly and Mitchell agreed to pay Plaintiff with Haim's money.  *Id.* at 79:23-80:24.

Plaintiff also stated the following regarding Haim's control over her salary: "after I worked

---

[3] As noted above, Defendant Haim also has a daughter, Bita Pouyafar f/k/a Bita Javaheri (Bita), but she is not a Defendant in this action.  *See* Defendants' Mot. at 3.
[4] This Court cites Plaintiff's deposition as much as possible in an effort to construe the arguments in Defendants' Mot. in favor of Plaintiff as required by the summary judgment legal standard discussed *infra*.

for a week with the man [Haim], I talked to him [Haim] about the salary, because his daughter told me *he was the one who was supposed to pay me*." *Id.* at 20:18-21 (emphasis added).

Notably, Plaintiff testified that she had no work-related conversations with Mitchell before she was hired. *See Id.* at 79:14-19:

Q. Did you have any conversations with Mitchell Javaheri prior to being employed?

A. No, not before being hired . . . he came with his wife and with food and he came, you know, just to make an acquaintance.

In general, when Plaintiff spoke to Haim's family, she spoke mostly to Haim's daughters, not Mitchell. *Id.* at 31:19-22.

3. Plaintiff's Living Arrangements with Defendant Haim and Related Work Performed

Defendant Haim was infirm and over the age of 80. *See* Declaration of Mitchell Javaheri, dated August 11, 2023 ("Mitchell Decl.") at ¶ 8, ECF 39-1. Plaintiff requested to live full time with Haim because she had no other place to live on Long Island where Defendant Haim was located. Plaintiff Dep. 17:3-8.

Defendant Haim's home has three small bedrooms, a kitchen, dining room, living room and two and half bathrooms. *Id.* at 23:14-22. Haim lived in one bedroom, Plaintiff lived in another and the third was locked, closed and virtually never used. *Id.* at 23:16-24:25. Notably, no one in the home used the dining room or kitchen to eat. *Id.* at 27:6-12. The kitchen did not even have a microwave or a kitchen table. *Id.* at 26:9-10 and 27:6-8. There were two full bathrooms, one that Plaintiff used and one that Haim used. *Id.* at 24:17-25:4. The third bathroom was not a full bathroom because it only had a sink and toilet. *Id.* at 24:23-25:4.

Finally, Plaintiff also testified that any cleaning of the bathroom or laundry she did was for Defendant Haim's benefit only. *Id.* at 61:3-10.

3

4. <u>Plaintiff's Cooking and Food Preparation for Defendant Haim</u>

Defendant Haim ate the same breakfast every day consisting of two fried eggs and tea, which Plaintiff prepared. *Id.* at 57:17-58:6. Haim ate breakfast in the living room (or maybe occasionally outside), not the kitchen or bedroom. *Id.* at 55:22-56:4.

For lunch, Defendant Haim asked for the same meal of fish and squash every day. *Id.* at 63:14-64:4. Plaintiff prepared squash and carrots for the whole week and the fish just needed to be cooked in the toaster. *Id.* Either Plaintiff or the caretaker Janet prepared the fish. *Id.* Plaintiff did not estimate how often she toasted the fish versus Janet. *Id.*

For dinner, Defendant Haim usually ate the same food prepared for lunch, which Plaintiff sometimes helped prepare as noted above. *Id.* at 65:3-7. Alternatively, during the week, Defendant Mitchell and his two sisters brought homemade food and spent time with Haim. Specifically, "[o]n Mondays, Mitchell would come with his family. His wife would cook a lot and bring over containers of food. Big containers of food. And she left the leftovers for the next day." *Id.* at 65:16-19. Plaintiff also stated that Defendant Haim's family members "kind of distributed" the other days of the week that they visited and that "the daughters would bring food sometimes" when they came as well. *Id.* at 65:16-66:11; *see also id.* at 28:22-29:5.

5. <u>Plaintiff's Role Regarding Defendant Haim's Medical Care</u>

"Plaintiff was not trained or licensed." Mitchell Decl. at ¶ 11.[5] Plaintiff did not know the medicine Defendant Haim took. Specifically, Plaintiff testified, "I don't know … I never asked about it. I never was interested in that." Plaintiff Dep. 56:25-57:3. Additionally, while Plaintiff testified that "most times" she would accompany the caretaker Janet to Defendant Haim's doctor appointments, she did not estimate how many appointments there were. *Id.* at 64:5-8. Plaintiff

---

[5] Note, Plaintiff does not argue that she was licensed anywhere in the record.

also stated that Janet was the individual who made the appointments.  *Id.* at 62:21-23.  Finally, Plaintiff only recalled two occasions when Defendant Haim was hospitalized and she stayed with him at the hospital.  *Id.* at 83:5-10.

6. Defendant Haim's Caretaker Janet

As noted above, Janet was Defendant Haim's caretaker who came to the house from 10:00 a.m. and stayed until at least 2:00 p.m. (sometimes later) from Monday through Friday.  *Id.* at 53:12-54:4.  Janet's tasks included, but were not limited to, transportation, shopping, putting out correct medicines, paying bills and attending doctor's appointments.  *Id.* at 57:10-11, 61:21-62:2 and 62:18-63:13.  She bathed Haim, communicated with the doctors, made appointments and took Haim out of the house.  *Id.*  In fact, Plaintiff specifically testified that Janet bathed Haim because Haim "did not trust" Plaintiff to do that.  *Id.* at 63:7-13.  Finally, when Janet came to Haim's home, Plaintiff had the opportunity to shower and do things for herself (sometimes for hours).  *Id.* at 62:11-17 and 64:9-14.

7. Plaintiff's Statements About Her Alleged Overtime

Notably, Plaintiff also conceded that she never asked anyone about overtime.  *Id.* at 70:18-23.  Likewise, Plaintiff never claimed to anyone in Defendant Haim's family that she was not being paid correctly.  *Id.* at 71:6-14.

**B.  Summary of Causes of Action**

Plaintiff's Complaint alleges seven causes of action against Defendants.  Specifically, Plaintiff alleges two violations of the FLSA: (1) violation of the Minimum Wage Provisions of the FLSA; and (2) violation of the Overtime Provisions of the FLSA.  *See* Plaintiff's Compl. at ¶¶ 73-82 and ¶¶ 83-86 respectively.  Additionally, Plaintiff alleges five violations of the New York Labor Law §§ 161, 170, 190 *et seq.* and 650 *et seq.* (NYLL): (1) violation of the New York Minimum

Wage Act; (2) violation of the Overtime Provisions of the NYLL; (3) violation of the Spread of Hours Wage Order of the New York Commissioner of Labor; (4) violation of the Notice and Recordkeeping Requirements of the NYLL; and (5) violations of the Wage Statement Provisions of the NYLL.  *Id.* at ¶¶ 87-92; ¶¶ 93-96; ¶¶ 97-100; ¶¶ 101-03; and ¶¶ 104-06 respectively.

### C.  Procedural History

On February 2, 2021, Plaintiff filed her Complaint against all Defendants.  *See* ECF 1.  The case was assigned to Judge Sandra J. Feuerstein and Magistrate Judge Steven Tiscione on the same day.  *See* ECF entry dated February 2, 2021.[6]

Defendants filed their Answer on April 26, 2021, which was later Amended on May 3, 2021.  *See* ECF 12 and 14.

On June 1, 2021, the parties consented to jurisdiction of the undersigned for all purposes pursuant to 28 U.S.C. § 636(c)(1).  *See* ECF entries dated June 1, 2021.

After mediation efforts, discovery and settlement discussion, the parties both filed their bundled instant Cross-Motions for Summary Judgment on September 26, 2023.  *See* ECF 39-40.

## II.  JURISDICTION

This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331, 1337 and 1343(a) (3)-(4).

## III.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A genuine dispute exists as to a

---

[6] Note, the case was previously assigned to Judge Rachel P. Kovner and Magistrate Judge Sanket J. Bulsara.  *See* ECF entry dated February 2, 2021.

material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute exists as to a material fact, the Court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). "If there is evidence in the record from which an inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Holt v. KMI-Cont'l*, 95 F.3d 123, 129 (2d Cir. 1996).

A "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as mere "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a showing sufficient to establish the existence of [each] element essential to [his] case . . . since a complete failure of proof concerning an essential element of [his] case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV. DISCUSSION

### A. This Court Grants Defendants' Motion for Summary Judgment with Respect to Plaintiff's FLSA Claims

*1. This Court Concludes That Defendant Mitchell Javaheri Was Not Plaintiff's Employer and That All FLSA Causes of Action Against Him Should be Dismissed*

This Court concludes that Defendant Mitchell Javaheri was not Plaintiff's employer and that all causes of action against him should be dismissed. Under the FLSA, an "employer" is "any

person acting directly or indirectly in the interest of an employer in relation to an employee." *See* 29 U.S.C. § 203(d).  To be clear, the FLSA does allow for joint employer liability.  *See Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 137-38, 141 (2d Cir. 2008); *Abuladze v. Apple Commuter Inc.*, No. 22CIV8684GHWRFT, 2024 WL 1073121, at *11 (S.D.N.Y. Jan. 23, 2024), *report and recommendation adopted*, No. 1:22-CV-8684-GHW-GS, 2024 WL 1073155 (S.D.N.Y. Feb. 7, 2024) ("Joint employment is a well-accepted concept, even though there is 'no independent test for joint employment under the FLSA.'") (quoting *New York v. Scalia*, 490 F. Supp. 3d 748, 776 (S.D.N.Y. 2020)).

Courts in the Second Circuit have applied an "economic reality" test to assess whether an employer-employee relationship exists, which includes the following four nonexclusive factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). "Despite these enumerated factors, however, a district court should consider any factor relevant to its assessment of the economic realities of an employer-employee relationship." *Khan v. Nyrene, Inc.*, No. 18-CV-557 (ARR) (ST), 2020 WL 1931282, at *3 (E.D.N.Y. Mar. 11, 2020), *report and recommendation adopted*, No. 18-CV-557 (ARR) (ST), 2020 WL 1929066 (E.D.N.Y. Apr. 21, 2020) (citing *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003)).  Finally, this Court recognizes that none of the *Carter* factors alone are dispositive.  *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988).  *See also* Plaintiff's Opp. at 4 (collecting cases for same proposition).[7]

---

[7] Note, Plaintiff's Opp. at 4-5 also argues that Defendant Mitchell was an employer under the NYLL.  However, as discussed *infra*, this Court declines to exercise supplemental jurisdiction over any NYLL claims since this Court grants

Here, Defendants' Mot. at 3 asserts that "Mitchell is Haim's son. He did not interview, talk to or hire Plaintiff before Haim hired her." (citing Mitchell Decl. ¶ 4).  Moreover, Defendants further argue that "Mitchell did not establish her job duties or tell her what work she would do or what hours she should work" *id.* (citations omitted) and that "[w]hen Plaintiff spoke to Haim's family, she spoke mostly to the daughters, not Mitchell."  *Id.* (citing Plaintiff Dep. 31:19-22)). Finally, Defendants assert that "Mitchell did not hire, fire, supervise or control Plaintiff's employment or determine her pay."  *Id.* at 4 (citing Mitchell Decl. ¶ 7).

In response, Plaintiff's Opp. at 5 argues that "Defendant Mitchell does not prove dispositively on Cross Motion that he did not have (1) power to hire and fire, (2) supervise and control employee work schedules or conditions of employment, or (3) determine the rate and method of payment."  (citing *Carter*, 735 F.2d at 12).  Glaringly, however, Plaintiff's Opp. at 6-8 (the main section discussing Mitchell's alleged employment) cites virtually no deposition testimony that supports this contention.[8]  This Court will review the pertinent testimony below now.

First, Plaintiff's Opp. at 6 argues that: "Defendant Mitchell admits that Plaintiff came to him, not Defendant Haim, to change the terms of her employment and payment. Defendant Mitchell admits that he acquiesced. That he and he alone made the change to Plaintiff's method of compensation. That he then paid Plaintiff directly. Though Defendant Mitchell does not want to admit it, at latest from then on, Defendant Mitchell *was holding the purse strings*." (emphasis

---

Defendants' Motion on the FLSA claims.  Moreover, this Court concludes that New York State courts are best suited to adjudicate Plaintiff's NYLL claims.

[8] To be clear, while this Court recognizes that the parties' cross-moved for summary judgment here, this Court notes Plaintiff's statement in her own Reply in support of her Motion indicating that Plaintiff's Opp. to *Defendants'* Mot. contains the most comprehensive discussion of Plaintiff's position about Defendant Mitchell's employer status.  *See* Plaintiff's Reply at 2 n.1 ("Plaintiff respectfully refers the Court to *Plaintiff's Memorandum of Law in Opposition* to Defendants' Motion for Summary Judgment Point B, served on the Defendants on or about September 11, 2023, and attached herewith as Exhibit 10, for a *detailed analysis* as to whether Defendant Mitchell Javaheri was Plaintiff's employer and whether a genuine issue of the material fact exists.") (emphasis added).

added).   After reviewing the record in full, Plaintiff is presumably referring to the following

deposition testimony from Defendant Mitchell:

> Q. Okay. You mentioned earlier that your father was also paying Ms. Uzakova. Was that always the case?
>
> A. At that point, that changed.
>
> Q. And then what happened when it changed?
>
> A. At that point, because she was complaining that my father -- you know, she has a hard time getting paid from my father, so I decided, at that point, that I would get the money from my father and I would pay her. This way, just to facilitate things so that she won't be aggravated every time she wants to get paid.

*See* Deposition of Mitchell Javaheri, dated September 20, 2022 ("Mitchell Dep.") at 22:15-23:5,

ECF 39-18.  Moreover, Defendant Mitchell also admitted that Plaintiff was given a raise.  *See Id.*

at 23:20-24:17 (emphasis added):

> Q. When did she get a raise from 600 to 700?
>
> A. I'm not a hundred percent sure, but I think either the second or the third year that she worked for us.
>
> Q. And who decided to give her a raise?
>
> A. She had discussed with my sisters that she's not happy with the money she's making and she wants to leave and look for another job, and we spoke to our father and we told her -- told him, at that time, that, you know, we think she's been here a while and she is familiar with what he needs, and what does he think about giving him (sic) a raise, *and he said he would -- he wouldn't mind going up to -- from 600 to $700 a week.*
>
> Q. And did you discuss this -- I'm talking about the raise -- did you discuss this with Ms. Uzakova?
>
> A. Yes.

Again, Plaintiff did not specify precisely which deposition testimony allegedly supports

Plaintiff's contention in Plaintiff's Opp. at 6 that, at some point, Defendant Mitchell "was holding

the purse strings."   Importantly however, the deposition testimony above makes clear that

Defendant Mitchell's *father* (Haim) ultimately decided to increase Plaintiff's salary from $600.00 to $700.00 a week.  Equally important, the above testimony emphasizes that Plaintiff's *entire* salary was derived from *Haim's* money.  Moreover, the below deposition testimony from both Defendant Mitchell and Plaintiff herself strongly undermines Plaintiff's contention that Defendant Mitchell had *any* control over Plaintiff's salary.  *See* Mitchell Dep. at 26:4-27:5 (emphasis added):

> *Q. Did Ms. Uzakova ever come to you and ask you for a raise or for additional compensation?*
>
> *A. Not me directly, no.*
>
> Q. So Ms. Uzakova never discussed with you directly anything to do with her pay; is that correct?
>
> A. That's correct.
>
> *Q. By the way, do you help your father financially?*
>
> *A. No, I don't.*
>
> *Q. So whatever money that your father was paying to Ms. Uzakova was his money, not any money that you would be giving her?*
>
> *A. That's correct, yes.*
>
> Q. Does your father, to your knowledge, does he have any source of income to be able to make those payments?
>
> A. Yes, he has a source of income.
>
> Q. What kind of a source of income does he have?
>
> A. He has savings.
>
> Q. Okay.
>
> A. He's not working currently, but he has savings, yes.

Relatedly, Plaintiff herself conceded that Defendant Mitchell never discussed Plaintiff's salary prior to Plaintiff being hired.  *See* Plaintiff Dep. at 79:14-19, ECF 39-5.

Q. Did you have any conversations with Mitchell Javaheri prior to being employed?

A. No, not before being hired . . . he came with his wife and with food and he came, you know, just to make an acquaintance.

Besides not citing *any* contrary deposition testimony to the above admissions, Plaintiff also fails to offer any persuasive response to the primary case law Defendants rely upon when arguing that Defendant Mitchell was *not* Plaintiff's employer.  Specifically, Defendants' Mot. at 8 relies upon *Davis v. Ching Yi Cheng*, No. 16CV1354ADSSIL, 2017 WL 6622545, at *7 (E.D.N.Y. Dec. 28, 2017).  *Cheng* is significant because that case provides a recent example in which the EDNY held that "[a]lthough the FLSA specifically contemplates joint employer liability, there is no information that lends the Court to believe that there is such liability" where "[t]he Plaintiff worked for only . . . the mother of the co-defendants [and] [t]here is *absolutely no evidence* that any of the other co-defendants; namely, Ms. Cheng's children, *had anything to do with* the Plaintiff's employment."  *Id.* (emphasis added).

Plaintiff attempts to distinguish *Cheng* by arguing the following: (1) "Whereas this matter is before the Court on a summary judgment standard, *Cheng* was decided after trial upon a preponderance of the evidence standard."; (2) "Whereas in this matter, there is no genuine dispute that Defendant Haim was not the sole decision maker concerning Plaintiff's employment, in *Cheng* only the elderly employer ('Ms. Cheng') made the decision to hire."; (3) "Whereas in this matter there is no dispute that Plaintiff was paid by both the Defendant Haim (who admits he was an employer) and Defendant Mitchell (who denies he was an employer), in *Cheng* only the elderly employer (Ms. Cheng) paid wages"; (4) "Whereas in this matter Plaintiff alleges that Defendant Mitchell had control over her employment, a supervisory role, and was able to change terms of her compensation, which he admits he did, in *Cheng* the theory of liability was no more than that the employer's family funded the employer's payments."  *See* Plaintiff's Opp. at 7-8.

This Court finds each of the above arguments unpersuasive based upon the deposition testimony already discussed. First, the fact that the record before this Court on summary judgment strongly favors Defendants' position justifies ruling consistently with *Cheng* here, despite *Cheng* being at the trial stage. Second, Plaintiff has provided no evidence in the record, nor has this Court been able to find any, suggesting Defendant Mitchell had *any* input in the hiring process as discussed *supra*. Third, *all* of the deposition testimony in the record unanimously indicates that any money from Plaintiff's salary came from Defendant Haim's savings, period. Plaintiff also has provided no case law, nor has this Court found any, where merely physically delivering a salary payment as Mitchell did constitutes employer status under the FLSA.[9] Fourth, there is no evidence in the record showing that Defendant Mitchell had *any* supervisory role over Plaintiff's employment at all.

Based upon the above reasons, this Court concludes that Defendant Mitchell was not Plaintiff's employer and that Plaintiff has failed to raise a genuine dispute of material fact here. Therefore, this Court grants summary judgment in favor of Defendant Mitchell on this issue.

### 2. *This Court Concludes That Plaintiff Was a Companion and Is Therefore Exempt from the FLSA*

This Court also concludes that Plaintiff was a companion and is therefore exempt from the FLSA. The FLSA exempts "any employee employed in domestic service employment to provide

---

[9] To be clear, even though Plaintiff did not provide any case law for the proposition that merely delivering money as a conduit to Plaintiff constitutes employer status, this Court did review Plaintiff's cited case law about the FLSA generally. Plaintiff's Opp. at 5 only relies on one case for the argument that "The central question in determining an employer-employee relationship under the NYLL is 'whether the alleged employer possessed the power to control the workers in question.'" *Id.* (quoting *Yu Y. Ho v. Sim Enters., Inc.*, No. 11-CV-2855 (PKC), 2014 WL 1998237, at *11 (S.D.N.Y. May 14, 2014)). In *Yu*, however, the factual posture is distinguishable from this case because *Yu* involved a suit from thirteen former workers against corporate entities alleged to own the factory operation at issue and two individuals alleged to be the plaintiffs' managers. *Id.* at 1. In short, there is no similar corporate structure at issue here. Nor does Plaintiff allege here that Defendants had anywhere near the degree of control that existed in *Yu*. *Id.* at 11-12. Finally, this Court concludes that *none* of Plaintiff's other cited case law about the FLSA undermines the Court's application of *Cheng* discussed above.

companionship services for individuals who (because of age or infirmity) are unable to care for themselves [.]" *See* 29 U.S.C. § 213(a)(15).

The older regulations historically defined "companionship services" as "fellowship, care and protection" including "household work related to the care of the aged or infirm person ... [or] performance of general household work: *Provided, however*, [t]hat such work is incidental, i.e. does not exceed 20 percent of the total weekly hours worked." 29 C.F.R. § 552.6 (effective until January 1, 2015) (italics in original); *Bonn-Wittingham v. Project O.H.R. (Off. for Homecare Referral), Inc.*, No. 16-CV-541 (ARR)(JO), 2016 WL 7243541, at *3 (E.D.N.Y. Dec. 14, 2016), *aff'd sub nom. Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71 (2d Cir. 2019).

The Department of Labor ("DOL") further clarified the difference between work related to the "personal care" of the patient and "general household work" in a March 15, 1995 opinion letter. It states that "such activities as cleaning the patient's bedroom, bathroom or kitchen, picking up groceries, medicine, and dry cleaning would be related to personal care of the patient" which would be "the type of household work that would be exempt work."  *See* U.S. Dep't of Labor, Opinion Letter on Fair Labor Standards Act (March 16, 1995), 1995 WL 1032475, at *1 ("DOL Letter"). The letter continues: "However, activities involving heavy cleaning such as cleaning refrigerators, ovens, trash or garbage removal and cleaning the rest of a 'trashy' house would be general household work or nonexempt work that is subject to the 20 percent time limitation."

Under new regulations effective January 1, 2015, only "fellowship and protection" services are exempt from FLSA protection. 29 C.F.R. § 552.6 (effective January 1, 2015). "The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person

14

in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being."  29 C.F.R. § 552.6(a).

The "provision of care" to elderly or infirm individuals, such as assistance with the activities of daily living, meal preparation and light housework, is exempt from the FLSA only if "provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek."  *Id.* "The current regulations, which exclude light housework from the companionship exemption, exempt fewer employees than the previous regulations. Therefore, any complaint that adequately pleads the inapplicability of the companionship exemption under the old regulations meets the requirements of the new regulations as well." *Bonn-Wittingham*, 2016 WL 7243541, at *3.

Here, after reviewing the record, this Court concludes that Plaintiff has failed to raise a dispute of material fact regarding application of the companionship exemption even under the new regulations.[10]  First and foremost, this Court notes a litany of concessions below that Plaintiff made regarding the nature of her work, which indicates companionship in this Court's view:

- **While Plaintiff did clean the bathroom and do laundry sometimes,** *she only did so for Defendant Haim.  See* Plaintiff Dep 61:3-10 ("Q. And when you say 'sometimes I would be busy doing something,' what is the busy doing something? A. I would clean his bathroom or I would do laundry or I would fold clothes. Q. Was he the only person that you were doing that for, for Haim? A. Yes.").

- **While Plaintiff estimates that she cleaned for 25% of her work performed, this figure is conclusory and she indicates that at least 50 percent of her time included fellowship with Defendant Haim.**  *Id.* at 61:11-18 ("Q. What percentage of your time would you say you were doing the washing and the cleaning as opposed to sitting with him or sitting in your room? A. About 25 percent of time I would do chores. I would clean. I would do laundry. I would clean up, fold clothes, and et cetera. About 50 percent of time I would sit next to him. And about 25 percent, I used for myself.").

- **Plaintiff only ever cleaned the house when** *Defendant Haim* **made it dirty, and, notably, she did not specify the** *frequency* **in which she needed to clean.**  *Id.* at 58:12-

---

[10] Recall that Plaintiff was employed by Haim from on or about August, 2015 until around August, 2019 after the new regulations became effective.  Pl. Compl. ¶¶ 7-8.

14 ("I would clean the house wherever he made it dirty. I would clean it up. And I would make it clean."). **Note, Plaintiff also does not dispute anywhere in the record that only she and Defendant Haim lived in the house.**

- **Defendant Haim only soiled his bedroom four times in four years.** *Id.* at 59:22-25 ("He could not make it to the bathroom from living room to the bathroom because incontinent. In the bedroom, he would soil. He would make a mess in the bedroom maybe four times all together."). **While Plaintiff said Haim also soiled the living room "many times" she could only specify "sometimes" twice or three times a week.** *Id.* at 60:5-11.

- **Defendant Haim's home only had three small bedrooms and one bedroom was virtually *never even used*.** *Id.* at 23:14-20 ("Q. So let's describe the house.  How many bedrooms were in the house? A. There were three small bedrooms in the house. He lived in one of them, and there was another bedroom next to it where I didn't really go. It was his wife's, it was locked, and there was a room where I lived.").

- **One of the three small bedrooms was Plaintiff's own bedroom.** *Id.* at 23:21-22.  ("Q. So you had your own bedroom? A. Yes."). **Moreover, Plaintiff's bedroom was only about "two by three meters."** *Id.* at 24:5-9 ("Q. With respect to your bedroom, how large of a bedroom was it? A. It was about two by three, and the reason why I know, is because a rug in there was a two by three rug."). **Finally, Defendant Haim's bedroom was only about twice the size.** *Id.* at 24:13-16 ("Q. And how large was Haim's bedroom? A. It was probably about twice the size of mine.").

- **No one used the dining room or the kitchen, which did not even have a kitchen table or microwave.** *Id.* at 27:11-12 ("A. There was a dining room, but nobody used it."); 59:9-10 ("A No, nobody was eating in the kitchen. There was no table in the kitchen."); 26:9-10 ("Q. Was there a microwave oven? A. There was no microwave, no.").[11]

- **Numerous meals were prepared or brought by Defendant Haim's family members rather than Plaintiff, particularly Mitchell's wife who cooked every week and brought the food in large containers**.  *See* Plaintiff Dep. 29:6-12 and 65:12-19 ("A Yes. On Mondays, Mitchell would come with his family. His wife would cook a lot and bring over containers of food. Big containers of food.").[12]

- **Defendant Haim ate his breakfast only in the living room and sat in his chair most of the day in the living room unless on some nice weather days he chose to sit on a small balcony (2 x 5 meters) outside.** *Id.* 55:20-56:9 ("Q. Where did he eat his breakfast? A. Right in the living room. Q. Did he ever sit-- Did he sit in the kitchen or he always sat in the living room? A. No. Q. Is it accurate to say the only room he sat in was the living room? A. Sometimes when the weather was nice he would sit in the balcony. Q. Can you describe the balcony, please?  A. Okay. So, this is a small balcony attached to the house about 5

---

[11] This Court also agrees with Defendants' Reply at 5 that "[t]here is no deposition testimony by Plaintiff that heavy cleaning of refrigerators, ovens and other large kitchen appliances was necessary."

[12] Note, for ease of reference, the quoted testimony above is from Plaintiff Dep. 65:16-18.

meters long and 2 meters wide. It's an outside place, which is attached to the house.").

- **Haim watched TV and read during the day, but Plaintiff did not read to him.** *Id.* at 56:20-21 ("Q. When he was sitting in the living room, did he watch TV? A. Yes. Q. I am sorry? Yes? A. Yes. Yes. Q. What else? Did he read a book? A. Yes. He read journals, magazines. And sometimes he would look at photo albums. Q. Did you read any books to him? A. No.").

- **Haim fell asleep in the afternoons and Plaintiff was free to sit there and not do any work.** *Id.* at 64:22-65-2 ("Q. Haim fell asleep? Is that what he did in the afternoons? A. Yes. Q. And what did you do while Haim was sleeping in the afternoons? A. I would just be sitting.").

- **After dinner, besides getting Haim to bed, Plaintiff just sat (*id.* at 68:5-8) and she went to bed immediately.** *Id* at 68:9-12 ("Q. And besides trying to get him to bed, what else did you do between dinner and when he finally went to bed? A. I was just sitting. Q. Once he went to bed, whatever time, whether it was 1:00 or midnight, what did you do after he went to bed? A. I would go to bed immediately.")

- **Plaintiff did not even know the medicines that Defendant Haim took, though she did give him pills put in daily containers by the caretaker Janet.** *Id.* at 56:22-57:11 ("Q. What time did he take his medicine in the morning? A. Immediately after breakfast. Q. What was the name of the medicine that he took? A. I don't know. I never -- I never asked about it. I never was interested in that. Q. Did he take pills or liquids? A. Pills. Q. How many pills did he take? A. About eight or nine. Q. How did you know which pills to give him? A. Janet put the pills in the containers and I would give him the pills.").

- **Defendant Haim's caretaker, Janet, came to the house from around 10:00 a.m. until at least 2:00pm from Monday through Friday, thereby providing Plaintiff with additional time to herself.** *Id.* at 53:12-54:4.

- **While Plaintiff may have helped clean up Defendant Haim after a bath, it was Janet that actually bathed Haim because he did not trust Plaintiff to do that.** *Id.* at 63:7-13. **In fact, Plaintiff was also not licensed or trained, though she did previously work unpaid for her elderly father-in-law for a year.** *Id.* at 12:7-13:11.[13]

- **When Janet came to the house, Plaintiff showered and did tasks/errands for herself while having opportunities to leave the house for hours.** *Id.* at 62:11-17; 64:9-14.

Notably, Plaintiff does not cite to *any* deposition testimony that contradicts her admissions above. However, this Court will review each of Plaintiff's assertions that Plaintiff argues shows a

---

[13] As discussed *supra*, Plaintiff does not argue that she was licensed and she never disputes the Mitchell Decl. at ¶ 11, which says she was not licensed.

genuine dispute of material fact regarding the companionship exemption.[14]   First, Plaintiff argues, without *any* citation, that she "was made responsible for a *host* of general nonexempt household duties. . ."   *See* Plaintiff's Opp. at 10-11 (emphasis added).   Rather than speculate as to what testimony Plaintiff is referring to regarding this "host", this Court will move on to Plaintiff's specific citations in later paragraphs.

Next, Plaintiff's Opp. at 11 argues that: "Plaintiff was required to clean the whole of the house, appliances, do trash and garbage removal and other maid/housekeeper-type work that was not only in excess of care for Mr. Haim *but for the benefit of, and required by, the rest of his family*." *Id.* (citing P. Tr. 58-61:18, BP.T. 16:6-18:7) (emphasis added).   However, as discussed *supra*, only Plaintiff and Defendant Haim lived in the home.   Moreover, no testimony from Plaintiff's Dep. 58-61:18 addresses any work that was for the benefit of Defendant Haim's family as a whole.   The same is true for the Deposition testimony of Bita Pouyafar, dated September 20, 2022 ("Bita Dep.") at 16:6-18:7.   Specifically, Bita provided that Plaintiff's cleaning was "minimal" and that the work was based upon *Haim's* needs.   *Id.*   Furthermore, Plaintiff's testimony again is simply too vague to show the 20 percent threshold was crossed.

Additionally, once again without any citation, Plaintiff's Opp. at 12 states that: "Defendants also incredibly argue that all of Plaintiff's services were only for Mr. Haim. They admit using the house and benefitting from Plaintiff's services throughout the week and weekend and throughout the house and grounds, bringing food, eating and making a mess and benefiting from Plaintiff's services along with Mr. Haim. They do not dispositively prove that Plaintiff's work was only for Mr. Haim at all in the face of their admitted presence."   While not cited in

---

[14] Note, upon this Court's review of Plaintiff's Opp., this Court concludes that no further analysis of Plaintiff's own Mot. and Reply is needed because, as expected, the arguments in those documents match those of Plaintiff's Opp to Defendants' Mot.

Plaintiff's Opp, this Court does recall Plaintiff's Dep at 66:12-14 in which Plaintiff claimed that she cleaned up after various family meals that took place at the house when Haim's family came over.  Glaringly, however, nowhere in Plaintiff's deposition testimony, or elsewhere in the record, does Plaintiff *ever* provide a relative breakdown of *how much time* she spent cleaning or how often this alleged general family housework was done.  Hence, even taken as true, Plaintiff has not sufficiently alleged the 20% threshold was met.

Similarly, Plaintiff makes the conclusory statement that she "was required to be available seven days a week and 24 hours a day. She was cooking, cleaning, doing laundry, washing Mr. Haim, changing his diapers, assisting him with walking and other activities around the house, taking him to the doctors and in general being on call at all times, including the nighttime." *See* Plaintiff's Opp. at 12.

Besides not detailing the time spent on any of these tasks in Plaintiff's Opp., the deposition testimony itself also fails to provide a sufficient breakdown and/or suggests that Plaintiff's work performed was minimal.  Specifically, Plaintiff conceded that she only recalled taking Defendant Haim to the hospital on *two occasions*.  *See* Plaintiff Dep. at 83:8-10.  As for cooking, while Plaintiff did prepare squash and carrots for Defendant Haim's lunches, *see* Plaintiff Dep. at 63:21-64:2, Plaintiff also testified that the caretaker Janet *or* Plaintiff herself prepared the fish for Defendant Haim's lunches (by placing it in a toaster), and Plaintiff did not distinguish between the frequency of her work versus Janet's.  *See id.* 63:24-64:2.

Furthermore, as for doctor visits, Plaintiff testified that she went with Defendant Haim and Ms. Castro "most of the times" but did not provide an estimate as to how many times there actually were or who provided Haim with the most assistance at these appointments.  *Id.* at 64:5-8. Additionally, Plaintiff did not testify about the frequency of how much she changed Defendant

Haim's diapers. *Id.* at 58:15-60:19.  Finally, Plaintiff also testified that she cleaned the house when Defendant Haim "would have bowel movements while walking and he made it dirty," but again did not quantify how much time she spent doing this cleaning either.  *Id.* at 58:16-17.[15]

Notably, Plaintiff's failure to provide a relative breakdown of her work performed has been recognized as a key factor by New York courts when deciding whether to apply the companionship exception.  Specifically, the SDNY in *Heredia v. Americare, Inc.*, No. 17 CIV. 06219 (RWL), 2020 WL 3961618, at *12 (S.D.N.Y. July 13, 2020) granted summary judgment in favor of Defendants when noting the following:

> Plaintiffs do generally identify some activities that fall into the non-exempt 'general household work' category, such as 'cleaning the entire house,' 'taking out trash,' and 'clean[ing] out the refrigerator' *but they do not indicate at all how much or what relative amount of time they devoted to such tasks*. As with Plaintiffs' vague generalities about their sleep and break time, their vague and non-specific statements about performing 'household work' are insufficient to sustain their claim based on time devoted to non-exempt household work.

(emphasis added) (citing *Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 74-75 (2d Cir. 2019) (affirming dismissal of similar vague claims by HHAs as to performing chores beyond that which is expected of home healthcare aides).  Moreover, the Court further held in *Heredia* that a plaintiff's statement that "I imagine more than 20 percent" followed by "more or less" when asked how much housework they performed was "mere conjecture" and therefore insufficient to avoid application of the companionship exemption.  *Id.* at 14.

Additionally, Defendants rely upon *Simoliuniene v. Est. of Maszer*, No. CV153723MASTJB, 2016 WL 821033, at *2-3 (D.N.J. Mar. 2, 2016) as persuasive authority,

---

[15] To be clear, this Court recognizes that Plaintiff's Rule 56.1 Statement of Undisputed Material Facts, *see* ECF 40-2, cites to deposition testimony for this and various other assertions of Plaintiff's work performed discussed in the paragraphs above.  However, after reviewing the pertinent deposition testimony from Plaintiff's Statement of Undisputed Material Facts, this Court concludes that none of the cited testimony changes the Court's analysis or conclusions reached.

which this Court finds instructive as well.  In *Simoliuniene*, the District Court of New Jersey granted defendants' motion to dismiss, despite plaintiff's claim that she was not covered by the "companionship exception" to the FLSA because she "performed duties and responsibilities far greater than that of mere companionship."  Notably, similar to here, plaintiff alleged that she performed tasks: "which included, but were not limited to, meal preparation, bed making, washing of clothes, and other similar services. [And her] work in these areas was far beyond incidental and exceeded twenty (20) percent of the total weekly hours worked."  *Id.* at 1.

After reviewing both *Heredia* and *Simoliuniene*, this Court agrees with Defendants' Mot. at 11-12 that "[t]he insufficient duties that plaintiff cited in her complaint in [Simoliuniene] are similar to those in our record and Defendants' deposition, such as: 'meal preparation, bed making, washing of clothes, and other similar services.'  However, those duties are those covered by the FLSA's definition of 'companionship services' because they consist of 'household work related to the care of the aged or infirm person.'" (quoting 29 C.F.R. § 552.6 (2014)).

Moreover, this Court further concludes that Plaintiff's statement that "[a]bout 25 percent of time I would do chores," *see* Plaintiff Dep. at 61:14-15, is conclusory in relation to the rest of Plaintiff's deposition testimony and the record as a whole.  As Defendants' Mot. at 11-12 points out, there are two key deficiencies with Plaintiff's statement in relation to the record that warrant granting Defendants' Mot. here.  First, Plaintiff does not attempt to provide any detailed "relative amount" beyond this statement regarding the frequency she allegedly performed the housework in question.  Second, within the context of housework performed, Plaintiff never distinguishes anywhere how such tasks could be separated from caring for Haim and be categorized as for the benefit of the family instead.[16]

---

[16] To be clear, the closest Plaintiff appears to come to discussing such household work for the benefit of the *entire family* is the fact that she cleaned up after some meals Plaintiff's Dep at 66:12-14.  However, nowhere does Plaintiff

Lastly, this Court also notes that Plaintiff has provided no case law in her Opp. that shows that a genuine dispute of material fact exists here regarding the companionship exemption based upon the facts before the Court.  Plaintiff's Opp. at 11 cites *Cowell v. Utopia Home Core, Inc.*, No. 14-CV-736 (SIL), 2016 WL 4186976, at *4 (E.D.N.Y. Aug. 8, 2016) for the proposition that Plaintiff's jobs were not uniformly "household work performed during the course of providing 'fellowship, care, and protection' for a patient."  However, *Cowell* addressed the issue of a Motion for Conditional Certification *from the Plaintiff*, which was denied anyway.  Additionally, nothing in the *Cowell* decision undermines this Court's application of the companionship exemption for the reasons discussed *supra*.

Likewise, Plaintiff is no more persuasive with her citation to *Lamur v. Sunnyside Cmty. Servs., Inc.*, No. 11-cv-4439, 2012 WL 3288770, at *1, 3 (E.D.N.Y. Aug. 9, 2012) (on motion to dismiss standard, denying motion to dismiss where the plaintiff alleged spending approximately one-third of her working week on, inter alia, "general household cleaning, including of external hallways, stairs, and common areas").  Unlike *Lamur*, Plaintiff does not allege the equivalent of cleaning such "common areas" here or "external hallways" and "stairs" that were at issue in *Lamur*. *Id.* Plaintiff simply cannot distinguish the persuasive authority of cases like *Heredia* and *Simoliuniene* and instead relies upon the conclusory assertion that citation to *Simoliuniene* is "inapt" because: the *Simoliuniene* plaintiff only alleged exempted activities and did not allege that she "engaged in any of the types of 'general household work' that are limited under the exemption."  *See* Plaintiff's Opp. at 10.  Again, however, Plaintiff's housework here clearly was for the benefit of Defendant Haim in conjunction with fellowship to Haim and there is no clear evidence that Plaintiff's housework exceeded 20 percent of her work performed.

---

allege that such cleaning comprised anywhere near 20% of her work.  Moreover, as discussed *supra*, there is no dispute that only Plaintiff and Defendant Haim lived in the house during Plaintiff's employment.

For the above reasons, this Court concludes that Defendant's Motion should be granted with respect to Plaintiff's FLSA claims because there is no dispute of material fact that Plaintiff was covered under the companionship exception.

**B.  This Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's NYLL Claims**

Having granted Defendants summary judgment against Plaintiff's FLSA claims (Plaintiff's first and second causes of action), this Court declines to exercise supplemental jurisdiction over Plaintiff's NYLL claims (the other five claims).  *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' " *Birch v. Pioneer Credit Recovery, Inc.,* No. 06–CV–6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986)); *see also Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 397–98 (E.D.N.Y. 2013).  Since no "exceptional circumstances" are present here, this Court declines to exercise supplemental jurisdiction over all of Plaintiff's claims under the NYLL and Plaintiff is free to bring those claims in New York State Court.[17]

**V.  CONCLUSION**

For the foregoing reasons, the undersigned GRANTS Defendants' Motion for Summary

---

[17] This Court is cognizant of the further precedent Defendants cite for the proposition that the U.S. Supreme Court has held that "only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in Federal court." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021); *Mahon v. Ticor Title Co.*, 683 F.3d 64 (2d Cir. 2012) (emphasis added).  However, this Court need not address the issue of whether standing exists here for any of the NYLL claims in federal court regarding "technical violations of the NYLL", *see* Defendants' Mot. at 14, because this Court declines to exercise supplemental jurisdiction over *all* of Plaintiff's NYLL claims anyway even if standing exists.

Judgment in its entirety and denies Plaintiff's Motion for Summary Judgment in its entirety.[18]

**SO ORDERED.**

                                        /s/ Steven Tiscione
                                         Steven Tiscione
                                         United States Magistrate Judge
                                         Eastern District of New York

Dated:  Central Islip, New York
March 28, 2024

---

[18] Notwithstanding that this Court is granting Defendants' Mot., this Court declines to award the attorneys' fees and costs requested in Defendants' Mot. at 1. *See Davis v. Ching Yi Cheng*, No. 16CV1354ADSSIL, 2017 WL 6622545, at *14 (E.D.N.Y. Dec. 28, 2017) ("Other cases have confirmed the principle that a successful Fair Labor Standards Act defendant [] usually is not entitled to attorney's fees. As such, the Court declines to award the Defendants attorney's fees or other cost.").